## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **SARAH RUMAGE WHALEN,** | * | **CIVIL ACTION NO.:** |
| **JOSEPH PAUL RUMAGE, JR., and** | * | |
| **WILLIAM SIMMS RUMAGE,** | * | **SECTION:" "** |
| **Individually and as the surviving children of** | * | |
| **JOSEPH P. RUMAGE, M.D.,** | * | **JUDGE** |
| **Plaintiffs** | * | |
| | * | **MAGISTRATE** |
| **VERSUS** | * | |
| | * | |
| **MONSANTO COMPANY** | * | |
| **Defendant** | * | |
| | * | **JURY TRIAL DEMANDED** |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## COMPLAINT

**NOW INTO COURT** come plaintiffs, Sarah Rumage Whalen, Joseph P. Rumage, Jr., and William Simms Rumage, persons of the full age of majority, domiciled in Orleans Parish, Louisiana, individually and as the surviving children of Joseph P. Rumage, M.D., who through undersigned counsel respectfully represent:

## STATEMENT OF THE CASE

1.  In 1970, Defendant Monsanto Company ("Monsanto") researched and discovered the herbicidal properties of glyphosate and began marketing glyphosate in products in 1974 under the brand name of Roundup®.

2.  Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops and lawn and garden vegetation.

3.  By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85-90 millions of pounds used annually.

4.  The use of glyphosate grew to 185 million pounds by 2007. As of 2013, glyphosate was the

world's most widely used herbicide.

5.     Monsanto is a multinational agricultural biotechnology corporation. Monsanto has declared its present domicile is Delaware. Monsanto's principal place of business operations is in St. Louis, Missouri. Monsanto operates a chemical manufacturing plant in Luling, Louisiana.

6.     Monsanto is the world's leading producer of glyphosate.

7.     As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market.

8.     The majority of these seeds are of the Roundup Ready® brand.

9.     Monsanto represented that the stated advantage of crops from Roundup Ready® seeds is that the crops substantially improve a farmer's ability to control weeds since glyphosate can be sprayed in the fields during the growing season allegedly without harming their crops.

10.    In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields, in the United States were the products of Roundup Ready® seeds.

11.    Monsanto's glyphosate products are registered in 130 countries and were approved for use on over 100 different crops.

12.    Monsanto's glyphosate products are marketed for consumer and commercial use, are sold retail directly to consumers and wholesale directly to commercial users, and are ubiquitous in the environment.

13.    Glyphosate does not exist naturally in the environment. Numerous studies confirm that glyphosate is now found in rivers, streams, and groundwater in areas where Roundup® is used.

14.    Glyphosate has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are otherwise not in direct contact with glyphosate.

15.    On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency

of the World Health Organization ("WHO"), issued an evaluation of glyphosate.

16.    The IARC evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world. It traced the health implications from exposure to glyphosate since 2001.

17.    On July 29, 2015, IARC issued the formal monograph relating to glyphosate.

18.    In the monograph issued by IARC, the IARC Working Group provided a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

19.    The IARC Working Group classified glyphosate as a Group 2A herbicide. Group 2A herbicides are probably carcinogenic to humans.

20.    The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin's lymphoma and other maematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma. Glyphosate exposure is associated with squamous cell and basal cell carcinomas.

21.    Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment.

22.    Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers including Joseph Paul Rumage, M.D., that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

## JURISDICTION AND VENUE

23.    Federal diversity jurisdiction in this Court is proper under 28 U.S.C. § 1332 because Plaintiffs are citizens of Louisiana, a different state from the Defendant Monsanto Company's state of domicile and citizenship in Delaware, and the aggregate amount in controversy exceeds $75,000, exclusive of interest and costs.

24.   This Court has personal jurisdiction over Monsanto because Monsanto has continuous and systemic contacts with the State of Louisiana. Specifically, Monsanto manufactures glyphosate at its plant in Luling, Louisiana, and regularly sells glyphosate in this district.

25.   This Court has personal jurisdiction over Monsanto because Monsanto knows or should have known that its Roundup® products are sold into the stream of commerce and throughout the State of Louisiana, and, more specifically, because Monsanto caused Roundup® to be sold to the deceased in the State of Louisiana.

26.   This Court has personal jurisdiction over Monsanto because Monsanto, a Delaware domicile, contracted with Dr. Joseph Paul Rumage, M.D., a Louisiana domicile, in Louisiana for professional services to be performed only in Louisiana at the Monsanto plant in Luling, Louisiana for approximately twenty years, believed to be from 1973 to 1992 or later. Monsanto owned and operated the manufacturing plant at which the deceased Joseph P. Rumage, M.D., as an independent contractor, provided ophthalmological services to Monsanto employees. The plant owned by Monsanto is also where glyphosate was manufactured and where the deceased was exposed to Roundup®, glyphosate and the harmful elements of Roundup® and glyphosate.

27.   Monsanto maintains sufficient contacts with the State of Louisiana such that this Court's exercise of personal jurisdiction over Monsanto does not offend traditional notions of fair play and substantial justice.

28.   Monsanto Company voluntarily registered (charter no. 34988365F) with the Louisiana Secretary of State to do business in the State of Louisiana and to avail itself of the laws, the benefits, the protections and the Courts of the State of Louisiana.

29.   Plaintiffs seek relief that is within the jurisdictional limits of the Court.

30.   Venue is proper within this District under 28 U.S.C. § 1391 because a substantial part of the

events and omissions giving rise to the claims asserted in this Complaint occurred in this District. The chemical manufacturing plant owned and operated by Monsanto and at which Monsanto manufactured glyphosate is located in Luling, Louisiana. Luling is a city located in the Parish of St. Charles, State of Louisiana. The United States District Court for the Eastern District of Louisiana encompasses the city of Luling and the Parish of St. Charles, State of Louisiana.

31.     Monsanto, as a corporate entity, is deemed to reside in any judicial district in which it is subject to personal jurisdiction.

## **PARTIES**

32.     Joseph Paul Rumage, M.D. died April 16, 2018. Plaintiffs Sarah Rumage Whalen, Joseph P. Rumage, Jr., and William Simms Rumage are claimants and the only children of Joseph Paul Rumage, M.D.. In accordance with La. Civ. Code Art. 2315 *et seq.* and La. Rev. Stat. 9:2800.53(5), Sarah Rumage Whalen, Joseph P. Rumage, Jr., and William Simms Rumage assert this survival action (La. Civ. Code Art. 2315.1) and wrongful death action (La. Civ. Code Art. 2315.2) against Defendant. Plaintiffs Sarah Rumage Whalen, Joseph P. Rumage, Jr., and William Simms Rumage are each competent individuals of majority and residents and citizens of the United States of America. Plaintiffs submit to the jurisdiction of the Court, allege that venue is proper, and that each is domiciled in the district of this Court.

33.     Defendant Monsanto Company is a for-profit Delaware corporation with its headquarters and principal place of business at 800 N. Lindbergh Blvd., St. Louis, Missouri 63167. At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and was the manufacturer of Roundup®. Monsanto Company voluntarily registered (charter no. 34988365F) with the Louisiana Secretary of State to do business in the State of Louisiana and to avail itself of the laws, the benefits, the

5

protections and the Courts of the State of Louisiana. Monsanto has regularly transacted and conducted business in the State of Louisiana, and has derived substantial revenue from its commerce within this State. Monsanto owns immovable property within the State of Louisiana and manufactures glyphosate at its plant in Luling, Louisiana.

34. On information and belief, each and every agent, representative and/or employee of Defendant worked and made the alleged representations as authorized by Defendant and as within the course and scope of their employment with Defendant. All acts of Defendant that are described herein that were taken by Defendant's employees, agents, and representatives were authorized and ratified with the consent and knowledge of Defendant.

## STATEMENT OF FACTS

35. Monsanto is a manufacturer of glyphosate, Roundup®, Roundup® products, glyphosate-based herbicides, and sprayers intended for the disbursement of Roundup® products. Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

36. Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis.

37. Plants exposed to glyphosate generally die within two to three days.

38. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing the grains.

39. For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use posed.

40. When Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough. Monsanto represented glyphosate could kill almost every weed without

causing harm either to people or to the environment.

41.  According to the WHO, the main chemical ingredient of Roundup® -- glyphosate -- is a probable cause of cancer.

42.  Monsanto continually assured the public and Joseph Paul Rumage, M.D. that Roundup® was harmless.

43.  Monsanto championed and, upon information and belief, falsified data and attacked legitimate studies that revealed the dangers of glyphosate and Roundup® .

44.  Upon information and belief, Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers and the general population including Joseph Paul Rumage, M.D. that Roundup® was safe.

### The Discovery of Glyphosate and the Development of Roundup®

45.  The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz.

46.  Upon information and belief, the first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name "Roundup®."

47.  From the outset, Monsanto, upon information and belief, marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use to the general public and Joseph Paul Rumage, M.D..

48.  Upon information and belief, Monsanto still markets Roundup® as safe today.

### Registration of Herbicides under Federal Law

49.  The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136, et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or

use, except as described by the Act. 7 U.S.C. § 136a(a).

50.    Because pesticides are toxic to plants, animals, and humans at least to some degree, the

EPA requires as part of the registration process, among other things, a variety of tests to

evaluate the potential for exposure to pesticides, toxicity to people and other potential

non-target organisms, and other adverse effects on the environment.

51.    Registration by the EPA, however, is not an assurance or finding of safety.

52.    The determination the EPA must make in registering or re-registering a product is not that

the product is "safe," but rather that use of the product in accordance with its label direction

"will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. §

136a(c)(5)(D).

53.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any

unreasonable risk to man or the environment, taking into account the economic, social, and

environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).

54.    FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a

registration should be granted or allowed for the product to continue to be sold in

commerce.

55.    The EPA and the State of Louisiana registered Roundup® for distribution, sale, and

manufacture in the United States and the State of Louisiana.

56.    FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conduct

the health and safety testing of pesticide products.

57.    The EPA has protocols governing the conduct of tests required for registration and the

laboratory practices that must be followed in conducting these tests.

58.    The test data produced by the registrant must be submitted to the EPA for review and

evaluation.

59.     The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

60.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered.

61.     The data necessary for registration of a pesticide has changed over time.

62.     The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-l.

63.     In order to re-evaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

64.     In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its primary risk assessment - in relation to the re-registration process - no later than July 2015.

65.     The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

### Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup

66.     Based on early studies showing that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985.

67.     Upon information and belief, after pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991.

68.     In so classifying glyphosate, however, the EPA made clear the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any

circumstances."

69.     Upon information and belief, on two occasions the EPA found that the laboratories hired by

        Monsanto to test the toxicity of its Roundup® products for registration purposes committed

        fraud.

70.     In the first instance, Monsanto, in seeking initial registration of Roundup® by the EPA,

        hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology

        studies relating to Roundup®.

71.     Upon information and belief, IBT performed about 30 tests on glyphosate and

        glyphosate-containing products, including nine of the 15 residue studies needed to register

        Roundup®.

72.     Upon information and belief, in 1976, the United States Food and Drug Administration

        ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data

        and the final report relating to the toxicological impacts of glyphosate.

73.     Upon information and belief, the EPA subsequently audited IBT.

74.     Upon information and belief, the EPA found the toxicology studies conducted by IBT for

        the Roundup® herbicide to be invalid.

75.     Upon information and belief, an EPA reviewer stated, after finding "routine" falsification of

        data at IBT, that it was "hard to believe the scientific integrity of the studies when they said

        they took specimens of the uterus from male rabbits."

76.     Upon information and belief, three top executives of IBT were convicted of fraud in 1983.

77.     In the second incident of data falsification, Monsanto, upon information and belief, hired

        Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for

        Roundup®.

78.     Upon information and belief, in that same year, the owner of Craven Laboratories and three

of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

79.   Despite the falsity of the tests and analyses that underlie its registration, within a few years of its launch, Monsanto was, upon information and belief, marketing Roundup® in 115 countries.

### The Importance of Roundup® to Monsanto's Profits

80.   Upon information and belief, the success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace.

81.   Largely due to the success of Roundup® sales, Monsanto's agriculture division was, upon information and belief, out-performing its chemical division's operating income, and that gap increased yearly.

82.   With its patent for glyphosate expiring in the United States in the year 2000, Monsanto, upon information and belief, needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

83.   In response, Monsanto began, upon information and belief, the development and sale of genetically engineered Roundup Ready® seeds in 1996.

84.   Since Roundup Ready® crops are allegedly resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season allegedly without harming the crop.

85.   Monsanto expanded its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds.

86.   The marketing and sales strategy also secured, upon information and belief, Monsanto's dominant share of the glyphosate/Roundup® market by coupling proprietary Roundup® seeds with continued sales of its Roundup® herbicide.

87.    Through a three-pronged strategy of increasing production, decreasing prices, and by

       coupling with Roundup Ready® seeds, Roundup® became, upon information and belief,

       Monsanto's most profitable product.

88.    Upon information and belief, in 2000, Roundup® accounted for almost $2.8 billion in sales,

       outselling other herbicides by a margin of five to one, and accounting for close to half of

       Monsanto's revenue.

89.    Today, glyphosate remains, upon information and belief, one of the world's largest

       herbicides by sales volume.

### *Monsanto knowingly falsely advertised Roundup®*

90.    In 1996, the New York Attorney General ("NYAG") sued Monsanto due to Monsanto's

       false and misleading advertising of Roundup® products.

91.    Specifically, the lawsuit challenged Monsanto's general representations that its spray-on

       glyphosate-based herbicides, including Roundup®, were "safer than table salt" and

       "practically non-toxic" to mammals, birds, and fish.

92.    The representations by Monsanto that the NYAG alleged were deceptive and misleading

       about the human and environmental safety of glyphosate and/or Roundup® are the

       following:

       A.     Remember that environmentally friendly Roundup® herbicide is biodegradable. It

              won't build up in the soil so you can use Roundup® with confidence along

              customers' driveways, sidewalks and fences ....

       B.     And remember that Roundup® is biodegradable and won't build up in the soil. That

              will give you the environmental confidence you need to use Roundup® everywhere

              you've got a weed, brush, edging or trimming problem.

       C.     Roundup® biodegrades into naturally occurring elements.

12

D.     Remember that versatile Roundup® herbicides stay were you put it. That means there's no washing or leaching to harm customer's shrubs or other desirable vegetation.

E.     This non-residual herbicide will not wash or leach in the soil. It...stays where you apply it.

F.     You can apply [Roundup®] with 'confidence because it will stay where you put it'; it binds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade [Roundup®] into natural products.

G.     Glyphosate is less toxic to rats than table salt following acute oral ingestion.

H.     Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

I.     You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

J.     Roundup® can be used where kids and pets will play and breaks down into natural material. (This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup®.)

93.  On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertising [in New York] that represent, directly or by implication" that:

A.     its glyphosate-containing pesticide products or any component thereof are safe, non- toxic, harmless or free from risk;

B.     its glyphosate-containing pesticide products or any component thereof

        manufactured, formulated, distributed or sold by Monsanto are biodegradable;

C.    its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

D.    its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics;"

E.    glyphosate-containing pesticides products or any component thereof are safer or less toxic than common consumer products other than herbicides;

F.    its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

94.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief it still has not done so as of today.

95.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®.

96.    The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

### *Classifications and Assessments of Glyphosate*

97.    The IARC process for classification of glyphosate followed IARC's stringent procedures for the evaluation of a chemical agent.

98.    Over time, the IARC Monograph program has reviewed 980 agents.

99.    Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be

Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

100.   The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.

101.   The IARC Monograph evaluations are performed by a panel of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest. The established procedure for IARC Monograph evaluations follows the following procedure that is generally accepted for peer-reviewed evaluations:

A.   One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts.

B.   Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members.

C.   One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment.

D.   Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation.

E.   Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in The Lance Oncology, and within a year after the meeting, the finalized Monograph is published.

F.   In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological

studies and cancer bioassays; and (c) representative mechanistic data.

    G.    The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

102.    In March 2015, IARC reassessed glyphosate.

103.    The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

104.    On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph Volume 112.

105.    For Volume 112, a Working Group of 17 experts from 11 countries met at IARC from March 3 - March 10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate.

106.    The March meeting of IARC Working Group culminated a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence.

107.    According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

108.    The studies considered the following exposure groups: (1) occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and (2) para-occupational exposure in farming families.

109.    Glyphosate was identified as the second-most-used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

110.    Exposure pathways are identified as air (especially during spraying), water, and food.

111.    Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

112.    The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work related exposure to glyphosate.

113.    The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

114.    The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells.

115.    One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

116.    In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma.

117.    A second study reported a positive trend for haemangiosarcoma in male mice.

118.    Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies.

119.    A glyphosate formulation promoted skin tumors in an initiation promotion study in mice.

120.    The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption.

121.    Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA).

122.    Upon information and belief, blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

123.    The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in

utero.

124.   The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.

125.   Glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

126.   The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.

127.   While this Agricultural Health Study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and multiple myeloma, hairy cell leukemia (HCL), and chronic lymphocytic leukemia (CLL), in addition to several other cancers.

### Other Earlier Findings About Glyphosate's Dangers to Human Health

128.   The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate.

129.   This EPA technical fact sheet predates IARC's March 20, 2015 evaluation.

130.   The EPA fact sheet describes the release patterns for glyphosate as follows:

Release Patterns:

Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. Glyphosate may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available. Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport, storage, and disposal.

131. In 1995, the Northwest Coalition for Alternatives to Pesticides reports that in California, the state with the most comprehensive program for reporting of pesticide-caused illnesses, glyphosate was the third most commonly reported cause of pesticide illness among agricultural workers.

### The Toxicity of Other Ingredients in Roundup®

132. In additional to the toxicity of the active ingredient glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Defendant's Roundup® products is more dangerous and toxic than glyphosate alone. Monsanto refuses to disclose the chemicals it has identified as "surfactants" that are included in Roundup®. Monsanto refuses to allow independent tests on glyphosates that include the "untested mixtures."

133. As early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.

134. In 2002, a study by Julie Marc entitled, "Pesticide Roundup® Provokes Cell Division Dysfunction at the Level of CDKl/Cyclin B Activation," revealed that Roundup® causes delays in the cell cycles of sea urchins but that the same concentration of glyphosate alone was ineffective and did not alter cell cycles.

135. A 2004 study by Marc and others entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

136. Marc and the other researchers noted that "cell cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell cycle checkpoints leads genomic instability and subsequent development of cancer from the initial affected cell." "[S]ince cell cycle disorders such as cancer result from dysfunction of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."

19

137. In 2005, a study by Francisco Peixoto entitled, "Comparative effects of the Roundup® and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that the effects of Roundup® on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone.

138. The Peixoto study further suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant polyethoxylated tallow amine (POEA), or in the alternative, due to a potential synergic effect between glyphosate and other ingredients in the Roundup® formulation.

139. In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells.

140. The Benachour-Seralini study tested dilution levels of Roundup® and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food.

141. The Benachour-Seralini researchers ultimately concluded that supposed "inert" ingredients contained in Roundup®, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone.

142. The Benachour-Seralini researchers further suggested that assessment of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide.

143. The Benachour-Seralini study confirmed that the adjuvants present in Roundup® are not, in fact, inert and that Roundup® is potentially far more toxic than its active ingredient glyphosate alone.

144. Luoping Zhang et al. recently conducted a meta-analysis of the research on glyphosate and glyphosate-based herbicides which include chemicals that work in combination with

glyphosate. The analysis is published under the title, "Exposure to Glyphosate-Based Herbicides and Risk for Non-Hodgkin Lymphoma: A Meta-Analysis and Supporting Evidence" in the February, 2019 edition of the peer-reviewed journal "Elsevier." The study found that "the overall meta-relative risk (meta-RR) of NHL [non-Hodgkin lymphoma] in GBH-exposed [glyphosate-based herbicides] individuals was increased by 41%." The study noted that GBH mixtures which contain glyphosate combined with other chemicals ("adjuvants"), "have been reported to exert synergistic toxic effects in mechanistic studies." The study concludes that there is "a compelling link between exposures to GBHs and increased risk for NHL."

145. Most testing of Roundup for long-term health damage has been done on glyphosate alone rather than on the full herbicide formulation, of which glyphosate makes up only around 40%. The remainder consists of inactive ingredients including ethoxylated adjuvants, chemicals that are added to improve the performance of the active ingredient.

146. Monsanto refuses to identify the main adjuvant for Roundup®. It is suspected that the main adjuvant for Roundup® is the ethoxylated adjuvant polyethoxylated tallowamine.

147. Mesnage, et al. report in the September, 2012 edition of *Elsevier* in "Ethoxylated adjuvants of glyphosate-based herbicides are active principles of human cell toxicity" that "[e]thoxylated adjuvants [combined with glyphosates] are thus not inert at all but cell membrane disruptors, and then induce severe mitochondrial alterations."

148. Upon information and belief, the results of these studies and the information upon which the meta-analyses are based were at all times available to Defendant. Defendant thus knew or should have known that Roundup® is more toxic than glyphosate alone and that safety studies of Roundup®, Roundup®'s adjuvants, and "inert" ingredients, and/or the surfactant POEA were necessary to protect Dr. Rumage and Plaintiffs from Roundup®.

*Recent Worldwide Bans on Roundup®/Glyphosate*

149.   Upon information and belief, several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since the IARC first announced its assessment for glyphosate in March 2015.

150.   More countries undoubtedly will follow suit as the dangers of the use of Roundup® become more widely known.

151.   The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which took effect at the end of 2015.

152.   In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

153.   The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

154.   France banned the private sale of Roundup® and glyphosate following the IARC assessment for glyphosate.

155.   Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "'Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup®' has been suspended."

156.   The Sri Lankan Government banned the private and commercial use of glyphosate, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

157. The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

### California's Proposition 65 Listing

158. On September 4, 2015, California's Office of Environmental Health Hazard Assessment ("OEHHA") published a notice of intent to include glyphosate on the state's list of known carcinogens under Proposition 65.

159. California's Safe Drinking Water and Toxic Enforcement Act of 1986 (informally known as "Proposition 65"), requires the state to maintain and, at least, once a year, revise and re-publish a list of chemicals "known to the State of California to cause cancer or reproductive toxicity."

160. The OEHHA determined that glyphosate met the criteria for the listing mechanism under the Labor Code following IARC's assessment of the chemical.

161. The list of known carcinogens, at a minimum, must include substances identified by reference in Labor Code § 6382(b)(l). That section of the Labor Code identifies "[s]ubstances listed as human or animal carcinogens by the International Agency for Research on Cancer (IARC)."

162. The IARC's classification of glyphosate as a Group 2A chemical ("probably carcinogenic to humans") therefore triggered the listing of glyphosate by the OEHHA as a chemical "known to the State of California to cause cancer or reproductive toxicity."

163. Under California law, a business that deploys a listed chemical in its products that is recognized to be a cause of cancer must provide "clear and reasonable warnings" to the public prior to exposure to the chemical.

164. To be clear and reasonable, under California law a warning must "(1) clearly communicate

that the chemical is known to cause cancer, and/or birth defects or other reproductive harm; and (2) effectively reach the person before exposure."

165. The California law also prohibits the discharge of listed chemicals into drinking water.

166. Monsanto disputed the listing decision and, in January 2016, filed a lawsuit against OEHHA and the agency's acting director, Lauren Zeise, in California state court, seeking declaratory and injunctive relief to prevent OEHHA from listing glyphosate as a carcinogen.

167. Upon information and belief, Monsanto alleged that OEHHA's exclusive reliance on the IARC decision signified that "OEHHA effectively elevated the determination of an ad hoc committee to an unelected, foreign body, which answers to no United States official (let alone any California state official), over the conclusions of its own scientific experts."

168. Upon information and belief, Monsanto further alleged that the Labor Code listing mechanism presented various constitutional violations because it "effectively empowers an unelected, undemocratic, unaccountable, and foreign body to make laws applicable in California."

169. Among other things, Monsanto argued, upon information and belief, that Proposition 65's requirement to provide a "clear and reasonable warning" to consumers that the chemical is a known carcinogen would damage its reputation and violate its First Amendment rights.

### *FDA Announces Testing of Glyphosate in Foods*

170. In 2014, upon information and belief, the U.S. Government Accountability Office (GAO) had severely rebuked the FDA for its failures to both monitor for pesticide residue, including that of glyphosate, and to disclose the limitations of its monitoring and testing efforts to the public.

171. The GAO had cited numerous undisclosed deficiencies in the FDA's process, specifically

highlighting its omission of glyphosate testing.

172.   In the past, both the FDA and the U.S. Department of Agriculture (USDA) had routinely
excluded glyphosate from their testing for the residues of hundreds of other pesticides, on
the rationale that it was too expensive and unnecessary to protect public health.

173.   On February 17, 2016, the U.S. Food and Drug Administration ("FDA") announced that,
for the first time in its history, the agency planned to start testing certain foods for
glyphosate residues. FDA spokeswoman Lauren Sucher explained: "The agency is now
considering assignments for fiscal year 2016 to measure glyphosate in soybeans, corn,
milk, and eggs, among other potential foods." Ms. Sucher now states that "the agency has
developed 'streamlined methods' for testing the weed killer."

174.   The FDA's move is significant as the agency possesses enforcement authority and can seek
action if pesticide residues exceed enforcement guidelines.

*Monsanto's Directions For Use*

175.   The Monsanto Roundup® was the only herbicide and glyphosate-product used by Dr.
Rumage. Dr. Rumage purchased the Monsanto Roundup® in different packaging. For
example, Dr. Rumage purchased and used the package titled, "Roundup® Ready-to-Use
Weed & Grass Killer III." The "Directions for Use" for the "Roundup® Ready-to-Use
Weed & Grass Killer III" direct the user should, "Adjust nozzle to the desired spray
setting." No instruction or warning directs that the Roundup® should not be sprayed as a
broad spray or mist.

176.   The directions for the product "Roundup® Ready-to-Use Weed & Grass Killer III"
describes First Aid instruction for exposure to the Roundup® "IF IN EYES" but there is no
First Aid instruction if the Roundup® is inhaled. There is no warning in the Directions for
Use that the Roundup® should not be inhaled.

177.   The Material Safety Data Sheet published 1/25/2001 by Monsanto for the Roundup

Original Herbicide reads in part:

> WARNING!
> Keep out of reach of children.
> CAUSES SUBSTANTIAL BUT TEMPORARY EYE INJURY
> HARMFUL IS SWALLOWED
> HARMFUL IF INHALED. . . .

178.   Monsanto never warned users of Roundup® including Dr. Rumage on the package that the

product had been identified as a carcinogen. Monsanto never warned users of Roundup®

that the product was unsafe.

179.   The Material Safety Data Sheet written and published 1/25/2001 by Monsanto for the

"Roundup Original Herbicide" reads in part:

> OSHA Status
> This product is hazardous according to the OSHA Hazard Communication
> Standard, 29 CFR 1910.1200.

180.   Monsanto never warned users of Roundup® including Dr. Rumage that the 'inert'

chemicals or surfactants contained in the Roundup® were ethoxylated adjuvants of

glyphosate-based herbicides that are active principles of human cell toxicity and are not

inert at all but cell membrane disruptors, and that they induce severe mitochondrial

alterations.

181.   The Material Safety Data Sheet written by Monsanto and published 1/25/2001 for the

Roundup Original® Herbicide discloses toxicological information. The MSDS  section for

"toxicological information" does not identify whether the particular information references

the "active ingredient" (presumably glyphosate) alone or the Roundup® glyphosate-based

solution that includes the adjuvants. The MSDS reads in part, "Data obtained on product or

on similar products are summarized below. Data obtained on active ingredient are

summarized below."

26

182. The Material Safety Data Sheet written and published 1/25/2001 by Monsanto for the "Roundup Original Herbicide" does not identify the surfactants contained in the Monsanto Roundup®. The MSDS simply identifies the surfactants as "[t]rade secret composition."

### Joseph Paul Rumage, M.D.'s Exposure to Roundup®

183. Dr. Rumage believed a beautiful garden was God's kiss of the earth. Dr. Rumage was an avid supporter and member of the Jefferson Parish Garden Club.

184. Dr. Rumage was a regular user of Monsanto's Roundup®. Dr. Rumage often joked with Monsanto's employees that his use of Monsanto's Roundup® kept the plant open.

185. Dr. Rumage maintained an immaculate garden at his home. The deceased, Dr. Rumage, applied Roundup® weekly on the grounds of his three properties.

186. Dr. Rumage also applied Roundup® routinely on the grounds of the four properties owned by Plaintiffs, his children. Dr. Rumage regularly carried a spray bottle of Roundup® in his car. It was not unusual for his children to arrive home to find Dr. Rumage spraying the weeds in the gardens of Plaintiffs with Roundup®.

187. Dr. Rumage was an anticipated and foreseeable consumer and end-user of Monsanto's Roundup®. Dr. Rumage always employed Roundup® in its reasonably anticipated use.

188. Dr. Rumage always used and applied Roundup® in conformity with all of Monsanto's instructions contained in the directions for use, instructions, and safe practices. Dr. Rumage always wore a hat, gloves, eyewear, and "scrubs" with long sleeves and long pants when he applied Roundup®.

189. Monsanto sold Roundup® in spray bottles. The spray bottle that was sold with Roundup® was manufactured, designed and sold by Monsanto to be used for the application of Roundup® by consumers such as Dr. Rumage

190. Dr. Rumage was a retail purchaser, consumer and end-user of Monsanto's Roundup® spray

27

bottle. All purchases of Monsanto Roundup® by Dr. Rumage occurred in the district in the State of Louisiana.

191.    Dr. Rumage applied Monsanto's Roundup® from the spray bottles that accompanied the product in conformity with all instructions.

192.    Monsanto consistently, affirmatively and expressly warranted and assured Dr. Rumage that glyphosage and Roundup® were safe and could not cause harm. Monsanto failed to provide an adequate warning to Dr. Rumage that Monsanto's Roundup® was a carcinogen.

193.    Joseph Paul Rumage, M.D. was a physician licensed by the State of Louisiana for the practice of medicine. Dr. Rumage was board-certified in ophthalmology.

194.    Monsanto contracted with Dr. Rumage, an independent contractor, to provide medical care and services to Monsanto employees approximately from 1973 to 1992 or later.

195.    As a condition of the contract for services, Monsanto required Dr. Rumage to provide medical services to Monsanto employees at the plant in Luling, Louisiana, where Monsanto produced glyphosate and the glyphosate-based herbicides including Roundup®. Monsanto owed a duty to Dr. Rumage to provide that the Monsanto premises were compliant with all OSHA requirements, including that the environment did not contain hazards as defined by 29 CFR 1910.1200.

196.    Monsanto invited Dr. Rumage to enter the premises at the Monsanto plant at Luling, Louisiana in accordance and in furtherance of the personal services contract with Monsanto.

197.    Upon information and belief, from 1973 to 1992 or later and while Dr. Rumage was present at the Monsanto plant and its environs, from time-to-time alarms sounded. Upon information and belief, when the alarms at the Monsanto plant went off while Dr. Rumage was on the Monsanto premises, the Monsanto employees represented to Dr. Rumage that

the alarms signaled an improper emission detected by a sensor or perhaps that the sensor itself was faulty. Monsanto consistently, affirmatively and expressly warranted and assured Dr. Rumage that any emission was not hazardous and that any emission could not cause harm, or that there was no emission. Monsanto assumed the status of a manufacturer of glyphosage and/or glyphosate-based herbicides when it consistently, affirmatively and expressly warranted and assured Dr. Rumage that any emission was not hazardous and that any emission could not cause harm, or that there was no emission.

198. As an ophthalmologist and in order to perform the medical services required by the Monsanto contract, Dr. Rumage's examination of the Monsanto employees and factory workers required him to place his hands, face and eyes in close proximity to each patient's face, hair and upper body, including shirts, jackets, lab coats and overalls worn by Monsanto employees, some of whom were directly exposed to Roundup® during the chemical product's manufacture shortly before their eye examination by Dr. Rumage. During these examinations, Dr. Rumage's facial skin and eyes, as well as his hair, nostrils, mouth and upper body clothing, were exposed to traces of the chemical product that were on and in the Monsanto employees' and factory workers' hair and clothing. Dr. Rumage always provided medical care to Monsanto employees that suffered from the chemical spills into the employees' eyes. Dr Rumage always wore a lab coat on the Monsanto premises. At the end of the examinations of the Monsanto employees for a particular day, the lab coat often smelled like Roundup®. Monsanto never cautioned Dr. Rumage that he should not come in contact with the Monsanto employees' clothing while he examined them.

199. Dr. Rumage worked as an independent contractor at Monsanto until approximately 1992. On information and belief, Monsanto exposed Dr. Rumage to glyphosage and/or

glyphosate-based herbicides including Roundup® without his knowledge or consent while Dr. Rumage was on the Monsanto premises.

200. It was not until 2001 that Monsanto retrofitted the existing glyphosate production unit at the Monsanto plant in Luling. The retrofit finally led to an annual reduction in the Toxics Release Inventory ("TRI") of over 1.3 million pounds of landfill solid waste and an annual savings of over 44 million gallons of water at the Luling glyphosate production unit. It was not until 2002 that Monsanto utilized a Six Sigma analysis. The use of the Six Sigma analysis improved the recovery of 'Glyphosate Intermediate' by 1.1 Mlbs. at the Luling plant.

201. In or around 2016, Dr. Rumage was diagnosed with cancer. Dr. Rumage's cancer, injury and death was caused and/or promoted by his exposure to Monsanto's Roundup®. Dr. Rumage would not have suffered cancer, injury, and untimely death but for Monsanto's Roundup® and Monsanto's actions. The plaintiffs visited Dr. Rumage at his home during his final months of suffering. Seeing their father in his deteriorating condition brought on by the cancer caused great pain and anguish for plaintiffs.

### *Timeliness of Claims*

202. Joseph Paul Rumage, M.D. died on April 16, 2018. The Plaintiffs, who are the surviving children of Dr. Rumage, filed this complaint within one year of their father's death (La. Civil Code Arts. 2315.1 and 2315.2).

203. Monsanto engaged in a scheme intentionally to withhold information from scientists and the public regarding glyphosate and the chemicals that are contained in Roundup®. Some researchers now have expressed uncertainty in current assessments of glyphosate formulations due to the fact that the full list of chemicals in the Monsanto GBHs (glyphosate-based herbicides) is protected by Monsanto as "trade secret composition" (per

the Monsanto MSDS for "Roundup Original® Herbicide") or "commercial business information" despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of those herbicide formulations.

204. Monsanto engaged in a scheme intentionally to misrepresent to the scientists and the public that the adjuvants and surfactants were "inert ingredients" in Roundup®. The distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no toxicological justification, given the increasing evidence that several so-called 'inert' adjuvants are toxic in their own right, and that they increase the carcinogenic effect of glyphosate.

205. Upon information and belief, instead of disclosing critical safety information about Roundup®, glyphosate, and the "untested mixtures," Monsanto has consistently and falsely represented in its labels and instructions to the public that its Roundup® products are safe when in fact the products are extremely hazardous.

206. Within the time period of any applicable statutes of limitations, Plaintiffs could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate was injurious to human health.

207. Plaintiffs did not discover and did not know of facts that would cause a reasonable person to suspect the risks associated with the use of and/or exposure to Roundup®; nor would a reasonable and diligent investigation by Plaintiffs have disclosed that Roundup® would cause illness to their father.

208. No physician told Dr. Rumage that his cancer could be associated with Roundup® or glyphosate.

209. Monsanto affirmatively and expressly represented and warranted to Dr. Rumage while he was on the Monsanto premises that no chemical, including Roundup® or glyphosate, with

which he may have come into contact could cause him harm.

210. Upon information and belief, all applicable statutes of limitations have also been tolled by Monsanto's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

211. During the entire time in which Dr. Rumage was exposed to Roundup®, neither Dr. Rumage nor the Plaintiffs knew exposure to Roundup® was injurious to Dr. Rumage's health or the health of others.

212. Plaintiffs first learned that the exposure to Roundup® can cause cancer and other serious illnesses only after an August 11, 2018 jury verdict in California in favor of Dewayne Johnson, a groundskeeper who was exposed to Roundup® and was later diagnosed with non-Hodgkin lymphoma.

### CLAIM ONE: PRODUCTS LIABILITY-
### UNREASONABLY DANGEROUS IN DESIGN

213. Plaintiffs incorporate by reference each and every allegation of this Complaint as if fully set forth herein, and further allege:

214. Plaintiffs bring this products liability claim against Defendant under the Louisiana Products Liability Act. La. Rev. Stat. 9:2800.51 *et seq*., 9:2800.56, and La. Civil Code Art. 2315.

215. Defendant, Monsanto produced, made, fabricated, constructed and designed Roundup® and the Roundup® products at a substantial profit. Monsanto is a "manufacturer" of Roundup® as defined by La. Rev. Stat. 9:2800.53(1).

216. The Roundup® products used by Plaintiff were unreasonably dangerous in design, manufacture, construction, and with regard to warnings, labeling, and warranties both express and implied . As a consequence, the Roundup® products were defective, per se. Defendant is liable for all damages caused by its unreasonably dangerous products pursuant

to the Louisiana Product Liability Act (LPLA) and Article 2315 et seq. of the Louisiana

Civil Code.

217.   At the·time Roundup® products left Defendant's control, there existed a practical,

technically feasible, and safer alternative design that was capable of preventing the harm to

Dr. Rumage. The alternative design would not have substantially impaired the reasonably

anticipated or intended function of Defendant 's Roundup® herbicides.

218.   The likelihood that the design of the  Defendant's Roundup® products would cause Dr.

Rumage's damage, and the gravity of the damage, far outweighed the burden on Monsanto

of adopting the alternative design and far outweighed the adverse effect, if any, of such

alternative design on the utility of the Roundup® products.

219.   At all times relevant to this litigation, Defendant engaged in the business of testing,

developing, designing, manufacturing, marketing, selling, distributing, and promoting

Roundup® products, which are defective and unreasonably dangerous to consumers, users

and other persons coming into contact with them, including Dr. Rumage and Plaintiffs,

thereby placing Roundup® products into the stream of commerce. These actions were

under the ultimate control and supervision of Defendant.

220.   At all times relevant to this litigation, Defendant designed, researched, developed,

formulated, manufactured, produced, tested, assembled, labeled, advertised, promoted,

marketed, sold and distributed the Roundup® products used by Dr. Rumage and/or to

which Dr. Rumage was exposed, as described above.

221.   Upon information and belief and at all times relevant to this litigation, Defendant's

Roundup® products were manufactured, designed and labeled in an unsafe, defective, and

inherently dangerous manner that was dangerous for use by or exposure to the public, and,

in particular, Dr. Rumage.

222. At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Louisiana and throughout the United States, including Dr. Rumage, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

223. Defendant's Roundup® products, at the time of manufacture and sale, were defective in design and unreasonably dangerous, subjecting users, including Dr. Rumage, to dangerous chemicals.

224. Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant, were defective in design and formulation in that when they left the control of Defendant's manufacturers and/or suppliers, they were "unreasonably dangerous" as defined by Louisiana law and because they were not as safe as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

225. Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant, were defective in design and formulation in that when they left the control of Defendants' manufacturers and/or suppliers, the foreseeable risks associated with these products exceeded the alleged benefits associated with their design and formulation.

226. Defendant knew that the Roundup® was unreasonably dangerous when the Roundup® left Defendant's control. Defendant failed to advise Plaintiff of the unreasonable danger, namely that Roundup® is a carcinogen. If Plaintiff had known that Roundup® would cause him to be harmed or to develop cancer, or if Plaintiff had known the Roundup® was defective and unreasonably dangerous for its intended use, Plaintiff would not have

purchased the product.

227.   Defendant's Roundup® products caused harm to Plaintiffs' father and caused his death despite that Plaintiffs' father used Roundup® products in the manner intended by Defendants.

228.   At all times relevant to this litigation, Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendant, were defective in design and formulation and were inherently dangerous for their intended use due to the following:

   A.   At the time Defendant's Roundup® products left the control of Monsanto, the Roundup® products were "unreasonably dangerous" and defective in design and formulation, and, consequently, more dangerous to an extent beyond that which an ordinary consumer would expect.

   B.   Defendant's Roundup® products were not reasonably safe as intended to be used.

   C.   At the time Defendant's Roundup® products left the control of Monsanto, Defendant's Roundup® products were unreasonably dangerous in that they were extremely hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

   D.   At the time Defendant's Roundup® products left the control of Monsanto, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

   E.   Defendant did not sufficiently test, investigate or study its Roundup® products and, specifically, the active ingredient glyphosate and the "surfactants", and the use of glyphosate in conjunction with the surfactants.

F.   Exposure to Roundup® and glyphosate-containing products presents a risk of harmful effects that outweigh any potential utility stemming from the use of the herbicide.

G.   Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, would cause Dr. Rumage's cancer and other severe illnesses and damages, and that the gravity of those damages outweighed the burden on Monsanto of adopting an alternative design and the adverse effect, if any, of such alternative design on the utility of the Roundup® products.

H.   Defendant did not conduct adequate post-marketing surveillance of its Roundup® products, and failed to take any action to advise Dr. Rumage and the public when Roundup® was recognized as associated with cancer.

I.   Defendant should have employed safer alternative designs and formulations but failed to do so.

J.   Defendant could have employed safer alternative designs and formulations.

K.   Defendant's Roundup® products were inadequately designed.

L.   The defective design of Defendant's Roundup® products resulted in products that were more dangerous than the ordinary consumer would expect.

M.   The Defendant's Roundup® products failed to perform in a manner reasonably expected in light of its nature and intended function and subjected the Plaintiffs to an unreasonable risk of harm beyond that contemplated by an ordinary person.

N.   The Defendant's Roundup® products were insufficiently tested.

229.   At all times relevant to this litigation, Dr.Rumage used and/or was exposed to the use of Defendant's Roundup® products in an intended or reasonably foreseeable manner without

knowledge of their dangerous characteristics.

230.   Plaintiffs and Dr. Rumage could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

231.   Plaintiffs and/or Dr. Rumage could not have discovered the defects and dangers in the Defendant's Roundup® products through the exercise of due care prior to August 2018.

232.   Defendant, as the designer, manufacturer, marketer, and seller of Roundup®, is held to the level of knowledge of an expert in its field, and Plaintiffs and/or Dr. Rumage did not have substantially the same knowledge.

233.   Due to the above, Defendant's Roundup® products were defective as defined by the Louisiana Products Liability Act (Louisiana Revised Statute 9:2800.51 et seq.) including, but not limited to, having defects in design, composition, manufacture, and inadequate warnings and instructions regarding the use and reasonably foreseeable misuse of the product.

234.   The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's products unreasonably dangerous to an extent beyond that which an ordinary consumer would contemplate.

235.   Defendant's Roundup® products were and are more dangerous than alternative products and Defendant could have designed its Roundup® products to make them less dangerous.

236.   At the time that Defendant designed its Roundup® products and at the time the products left Monsanto's control, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

237.   At the time Roundup® products left Defendant's control, there was a practical, technically feasible, and safe alternative design that would have prevented the harm without

substantially impairing the reasonably anticipated or intended function of Defendant's Roundup® herbicides.

238. Defendant's defective design of Roundup® amounts to willful, wanton, and/or reckless conduct by Defendant without regard for the health and safety of the users of the Roundup®.

239. Therefore, as a result of unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to Plaintiffs.

240. The defects in Defendant's Roundup® products were substantial, proximate and contributing factors in causing Dr. Rumage's and Plaintiff's grave injuries, and, but for Defendant's misconduct and omissions, Dr. Rumage and Plaintiffs would not have sustained their injuries and damages.

241. As a direct and proximate result of the actions of Defendant, Dr. Rumage suffered from grave injuries, repeatedly endured pain and discomfort associated with the disease and the drug and radiation treatments, and ultimately died from the disease caused by exposure to Defendant's product, as well as economic hardship incurred by Dr. Rumage, including considerable financial expenses for medical care, treatment and funeral expenses.  The children of Dr. Rumage are aggrieved by the loss of Dr. Rumage, the beloved patriarch of the family, friend, and loving father.

242. Defendant is justly and truly responsible for all damages it caused to Dr. Rumage and Plaintiffs and for all damages itemized herein, including costs and interest.

## CLAIM TWO: PRODUCTS LIABILITY-
## UNREASONABLY DANGEROUS DUE TO FAILURE TO WARN

243. Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein, and further allege:

244.  Plaintiffs bring this products liability claim against Defendant under the Louisiana Products
      Liability Act. La. Rev. Stat. 9:2800.51 *et seq*., 9:2800.57, and La. Civil Code Art. 2315.

245.  Defendant, Monsanto produced, made, fabricated, constructed and designed Roundup® and
      the Roundup® products at a substantial profit. Monsanto is a "manufacturer" of Roundup®
      as defined by La. Rev. Stat. 9:2800.53(1).

246.  At all times relevant to this litigation, Defendant engaged in the business of testing,
      developing, designing, manufacturing, marketing, selling, distributing, and promoting
      Roundup® products, which are defective and unreasonably dangerous to consumers,
      including Dr. Rumage, because they do not contain adequate warnings or instructions
      concerning the dangerous characteristics of Roundup® and specifically, the active
      ingredient glyphosate and the use of adjuvants and/or surfactants such as POEA.

247.  Defendant researched, developed, designed, tested, manufactured, inspected, labeled,
      distributed, marketed, promoted, sold, and otherwise released into the stream of commerce
      its Roundup® products, and in the course of same, directly advertised or marketed the
      products to consumers and end users, including to Dr. Rumage. Defendant had a duty to
      warn of the risks associated with the reasonably foreseeable uses (and misuses) of
      Roundup® and glyphosate- containing products and a duty to instruct on the proper, safe
      use of these products.

248.  At all times relevant to this litigation, Defendant had a duty to properly test, develop,
      design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain
      supply, provide proper warnings, and to take such steps as necessary to ensure that its
      Roundup® products did not cause users and consumers to suffer from unreasonable and
      dangerous risks.

249.  Defendant had a continuing duty to instruct on the proper, safe use of these products.

250.   Defendant failed to investigate, study, test or promote the safety of the Roundup® products

251.   Defendant, as manufacturer, seller, or distributor of chemical herbicides, is held to the

knowledge of an expert in the field.

252.   At the time the Roundup® left the control of Monsanto, Defendant had a duty to provide to

Dr. Rumage adequate warnings or instructions regarding the full and complete risks of

Roundup® and glyphosate-containing products because it knew or should have known of

the unreasonable risks of harm associated with the use and/or exposure to these products.

At the time the Roundup® products left Monsanto's control, the Roundup® products

possessed a characteristic, namely that it was carcinogenic, that may cause damage.

Monsanto failed to use reasonable care to provide an adequate warning of such

characteristic and its danger to users and handlers of the product, including Dr. Rumage.

253.   At the time the Roundup® products left Monsanto's control, the Roundup® products

possessed a characteristic, namely that the surfactants, alone or combined with glyphosate,

may cause an increased risk of cancer. Monsanto failed to use reasonable care to provide an

adequate warning of such characteristic and its danger to users and handlers of the product,

including Dr. Rumage.

254.   At the time the Roundup® products left Monsanto's control, the Roundup® products

possessed a characteristic, namely that the surfactants had never been subjected to

examination  by the EPA, the Louisiana Department of Agriculture and Forestry, the

Louisiana Department of Environmental Quality, or any independent examiner for safety

and efficacy, and that the untested surfactants may cause damage. Monsanto failed to use

reasonable care to provide an adequate warning of such characteristic and its danger to

users and handlers of the product, including Dr. Rumage.

255.   At the time the Roundup® products left Monsanto's control, Monsanto failed to provide an

adequate warning that the Roundup® products included secret ingredients. Monsanto identified these undisclosed ingredients only as "[t]rade secret composition" in its MSDS. Monsanto failed to use reasonable care to provide an adequate warning of such characteristic and that the danger to users and handlers of the product, including Dr. Rumage, could not be independently discovered or known due to the nondisclosure.

256.   At the time the Roundup® products left Monsanto's control, Monsanto failed to provide an adequate warning that the Roundup® products were considered hazardous according to the OSHA Hazard Communication Standard, 29 CFR 1910.1200. Monsanto identified this classification only in its MSDS. Monsanto failed to use reasonable care to provide an adequate warning of the reasons the characteristics of Roundup® products required such a classification.

257.   The Roundup® products were and are dangerous to an extent beyond that which would be contemplated by the ordinary user or handler of the product, with the ordinary knowledge common to the community as to the product's characteristics. Monsanto intentionally failed to provide a warning of the risk of cancer associated with the Roundup® products because a reasonable person would not risk developing cancer to apply the Roundup® products.

258.   Dr. Rumage did not know and reasonably could not be expected to know of the carcinogenic characteristic of the Roundup® products and the danger posed by the characteristic without an adequate warning on the Roundup® products.

259.   Monsanto would have acquired knowledge that the Roundup® products may cause damage and that Roundup® products contained the characteristic of a carcinogen had Monsanto acted as a reasonably prudent manufacturer.

260.   Monsanto acquired knowledge before and after the Roundup® products left its control that the Roundup® products may cause damage and that Roundup® products contained the

characteristic of a carcinogen.

261. Monsanto had a duty to use reasonable care to provide to Dr. Rumage and the public with an adequate warning of the carcinogenic characteristic of the Roundup® products and its danger as a carcinogen after it learned of the characteristic.

262. Monsanto had a duty to use reasonable care to provide to Dr. Rumage and the public with an adequate warning of the carcinogenic characteristic of the Roundup® products and its danger as a carcinogen after a reasonably prudent manufacturer would have learned of the characteristic.

263. Monsanto failed to provide Dr. Rumage and the public with an adequate warning of the carcinogenic characteristic of the Roundup® products and its danger as a carcinogen after Monsanto learned or should have learned of the carcinogenic characteristic of the Roundup® products.

264. Defendant failed to investigate, study, test, or promote the safety of its Roundup® products.

265. Defendant also failed to minimize the dangers to users and consumer of its Roundup® products and to those who would foreseeably use or be harmed by Defendant's herbicides, including Dr. Rumage.

266. Despite the fact that Defendant knew or should have known that Roundup® products posed a grave risk of harm, it failed to warn of the dangerous risks associated with their use and exposure.

267. The dangerous propensities of Monsanto's Roundup® products and the carcinogenic characteristics of glyphosate and glyphosate-containing products, as described above, were, upon information and belief, known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied, or sold the product, and the carcinogenic characteristics of glyphosate and

glyphosate-containing products were not known to end users and consumers, such as Dr. Rumage.

268.    Upon information and belief, Defendant knew or should have known that its Roundup® and glyphosate-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products.

269.    Upon information and belief, Defendant has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

270.    Upon information and belief and at all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Louisiana and throughout the United States, including Dr. Rumage, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

271.    At all times relevant to this litigation, Dr. Rumage used and/or was exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

272.    Dr. Rumage could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of his exposure.

273.    Upon information and belief, Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, but it failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including

agricultural and horticultural applications.

274.  The information that Defendant did provide or communicate on its package failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers, horticultural workers and/or at-home users to utilize the products safely and with adequate protection.

275.  Instead, Defendant, upon information and belief disseminated information that was incomplete, inaccurate, false, and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk or injuries associated with use of and/or exposure of Roundup® and glyphosate; continued to aggressively promote the alleged efficacy of its products, even after it knew or should have known of the unreasonable risks form use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing, promotion, and intimidation, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

276.  To this day, Defendant, upon information and belief,  has failed to adequately and accurately warn of the true risks of injuries and/or death associated with the use and exposure to Roundup® and its "active" ingredient glyphosate, a probable carcinogen, along with the adjuvants and/or surfactants such as POEA.

277.  As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant and when they were used by Dr. Rumage and when he was exposed to the Roundup® products.

278.  Defendant is liable to Plaintiffs for injuries and death to Dr. Rumage caused by Defendant's failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its Roundup® products and the risks

associated with the use of or exposure to Roundup® and glyphosate.

279. The defects in Defendant's Roundup® products were substantial, proximate, and contributing factors in causing Dr. Rumage's injuries and death, and, but for Defendant's misconduct and omissions, Dr. Rumage would not have sustained his injuries and would not have died from cancer.

280. Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products and their application, Dr. Rumage would have avoided the risk of developing injuries as alleged herein and Dr. Rumage would have obtained alternative herbicides or chosen not to use herbicides at all.

281. As a direct and proximate result of Defendant placing its defective Roundup® products containing inadequate warnings into the stream of commerce, Dr. Rumage suffered from grave injuries, repeatedly endured pain and discomfort associated with the disease and the drug and radiation treatments, and ultimately died from the cancer caused by exposure to Defendant's product, as well as economic hardship incurred by Dr. Rumage as well as by the Plaintiffs.

282. Defendant is justly and truly responsible for all damages it caused to Dr. Rumage and Plaintiffs and for all damages itemized herein, including costs and interest.

### CLAIM THREE: PRODUCTS LIABILITY-
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

283. Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein, and further allege:

284. Plaintiffs bring this products liability claim against Defendant under the Louisiana Products Liability Act. La. Rev. Stat. 9:2800.51 *et seq.*, 9:2800.58, and La. Civil Code Art. 2315.

285. Upon information and belief and at all times relevant to this litigation, Defendant engaged

in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to users and consumers, including Dr.  Rumage, thereby placing Roundup® products into the stream of commerce.

286.   Upon information and belief, the aforesaid actions were under the ultimate control and supervision of Defendant.

287.   Before the time that Dr. Rumage was exposed to the Roundup® products, Defendant impliedly warranted to its consumers and users, including Dr. Rumage, that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as safe horticultural herbicides.

288.   Defendant, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products and Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA an increased risk of developing severe injuries, including Dr. Rumage's injuries and death.

289.   Dr. Rumage and Plaintiffs reasonably relied upon what was reasonably assumed to be skill, superior knowledge and judgment of Defendant and upon its implied warranties that Roundup® products were of merchantable quality and fit for their intended purpose or use.

290.   Plaintiff was the intended third-party beneficiary of the implied warranties made by Defendant to the purchasers of the Roundup® products.

291.   The Roundup® products were expected to reach and did in fact reach consumers and users, including Dr. Rumage and Plaintiffs, without substantial change in the condition in which they were manufactured and sold by Defendant.

292.   At all times relevant to this litigation, Defendant was aware that consumers and users of its

products, including Dr, Rumage and Plaintiffs, would use Roundup® products as marketed by Defendant, which is to say that Dr, Rumage and Plaintiffs were the foreseeable users of Roundup®.

293.   Defendant intended that its Roundup® products be used in the manner in which Dr. Rumage  in fact used them and Defendant impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

294.   In reliance upon Defendant's implied warranty, Dr. Rumage used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendant.

295.   Dr. Rumage could not have reasonably discovered or known of the risks of serious injury and death associated with Roundup® or glyphosate or Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA.

296.   Defendant breached its implied warranty to Dr. Rumage in that its Roundup® products were not of merchantable quality, were not safe, and were not fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

297.   The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

298.   As a direct and proximate result of Defendant's wrongful acts and omissions, Dr. Rumage and  Plaintiffs have suffered severe and permanent physical and emotional injuries. Dr. Rumage  suffered from grave injuries, repeatedly endured pain and discomfort associated with the disease and the drug therapy and radiation treatments, and ultimately died from the

disease caused by exposure to Defendant's product, as well as economic hardship incurred by the Plaintiffs, including considerable financial expenses.

299.   Defendant is justly and truly responsible for all damages it caused to Dr. Rumage and Plaintiffs and for all damages itemized herein, including costs and interest.

## CLAIM FOUR: PRODUCTS LIABILITY-
## BREACH OF EXPRESS WARRANTY

300.   Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein, and further allege:

301.   Plaintiffs bring this products liability claim against Defendant under the Louisiana Products Liability Act. La. Rev. Stat. 9:2800.51 *et seq*., 9:2800.58, and La. Civil Code Art. 2315.

302.   During the almost twenty years that Dr. Rumage provided medical services to the Monsanto employees at the plant in Luling, Louisiana that manufactured glyphosate, Roundup® products, and glyphosate-based herbicides, Dr. Rumage was exposed to glyphosate, Roundup® products, and glyphosate-based herbicides.

303.   Dr. Rumage was required to touch the Monsanto employees and to come close to them in order to perform the medical services required by the Monsanto contract.

304.   Upon information and belief, while Dr. Rumage was at the Monsanto plant from time-to-time, alarms were triggered by the release of gases and glyphosate that were being processed at the plant.

305.   Monsanto consistently, affirmatively and expressly warranted and assured Dr. Rumage that any emission or contact with glyphosate and/or glyphosate-based herbicides was not hazardous.

306.   Dr. Rumage reasonably relied on Monsanto's express warranty that Roundup® was safe. Dr. Rumage would not have purchased and used the Roundup® but for the express

warranty made by Monsanto.

307. The express warranty made by Monsanto to Dr. Rumage that Roundup® was safe induced Dr. Rumage to use the Roundup®, and Dr. Rumage's cancer and damages were proximately caused because the express warranty was untrue.

308. Upon information and belief and at all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including the deceased, Dr. Rumage, thereby placing Roundup® products into the stream of commerce.

309. At all times relevant to this litigation, Defendant expressly represented and warranted to Plaintiff and the purchasers of its Roundup® products, by and through statements made by Defendant in labels, publications, package inserts, and other written materials intended for consumers and the general public, that its Roundup® products were safe to human health and the environment, and effective, fit, and proper for their intended use.

310. Defendant advertised, labeled, marketed, and promoted Roundup® products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that its Roundup® products would conform to the representations.

311. These express representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup® and glyphosate and Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA.

312. Defendant knew and/or should have known that the risks expressly included in Roundup® warnings and labels did not and do not accurately or adequately set forth the risks of

developing the serious injuries complained of herein.

313.    The representations about Roundup®, as set forth herein, contained or constituted affirmations of fact or promises made by Monsanto as seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

314.    Defendant placed its Roundup® products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate and Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA.

315.    Defendant breached these warranties because, among other things, its Roundup® products were defective, unreasonably dangerous, unfit for use, did not contain labels or adequate warnings representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose.

316.    Specifically, Defendant breached the warranties in the following ways:

A.    Defendant represented through its labeling, advertising, and marketing materials that its Roundup® products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or exposure to Roundup and glyphosate and Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA by expressly limiting the risks associated with the use and/or exposure within its warnings and labels.

B.    Defendant represented to Plaintiff that its Roundup® products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the "active"

ingredient in Roundup, and Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA, had carcinogenic properties, and that its Roundup® products, therefore, were not safer than available alternatives.

C.      Monsanto's warranties and representations, as described herein, concerning the qualities of Roundup® products, became a basis of the bargain for Dr. Rumage's purchases of Roundup® products.

317.   Monsanto's warranties and representations, as described herein, concerning the qualities of Roundup® products, became a basis of the bargain for Dr. Rumage's purchases of Roundup® products.

318.   Dr. Rumage justifiably and detrimentally relied on the express warranties and representations of Defendant in the purchase and use of its Roundup® products.

319.   When Dr. Rumage made the decision to purchase Roundup®, he reasonably relied upon Defendant to disclose known defects, risks, dangers, and side effects of Roundup® and glyphosate and Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA.

320.   Defendant had sole access to material facts concerning the nature of the risks associated with its Roundup® products as expressly stated within its warnings and labels, and Defendant knew that consumers and users such as Dr. Rumage could not have reasonably discovered that the risks expressly included in Roundup® warnings and labels were inadequate and inaccurate.

321.   Plaintiffs and Dr. Rumage had no knowledge of the falsity or incompleteness of Defendant's statements and representations concerning Roundup®.

322.   Dr. Rumage used and/or were exposed to the use of Roundup® as researched, developed, designed, tested, formulated, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Defendant.

323. Had the warnings and labels for Roundup® products accurately and adequately set forth the true risks associated with the use of such products, including Dr. Rumage's injuries and death, rather than expressly excluding such information and warranting that the products were safe for their intended use, Plaintiffs and Dr, Rumage could have avoided the injuries and death and damages complained of herein.

324. Defendant breached both implied and express warranties, and is liable for misrepresentations, breach of contract, fraud and deceptive business practices as defined under Louisiana law.

325. As a direct and proximate result of Defendant's wrongful acts of omissions, Dr. Rumage suffered from grave injuries, repeatedly endured pain and discomfort associated with the disease and the drug therapies and radiation treatments, and ultimately died from the disease caused by exposure to Defendant's product, as well as economic hardship incurred by the Plaintiffs, including considerable financial expenses.

326. Defendant is justly and truly responsible for all damages it caused to Dr. Rumage and Plaintiffs and for all damages itemized herein, including costs and interest.

## CLAIM FIVE: NEGLIGENCE

327. Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein, and further allege:

328. Defendant, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, and/or promoted.

329. Defendant, directly or indirectly, caused Roundup® products to be purchased and/or used by Dr. Rumage.

330. At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging,

sale, and distribution of its Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

331.   At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertising, and sale of its Roundup® products. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup® and, in particular, its active ingredient glyphosate along with adjuvants and/or surfactants such as POEA.

332.   At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care should have known, of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate along with adjuvants and/or surfactants such as POEA.

333.   Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause Dr. Rumage's injuries and death and thus created a dangerous and unreasonable risk of injury to the users of these products.

334.   Defendant knew or, in the exercise of reasonable care should have known, that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Dr. Rumage from the dangerous characteristics of Roundup®.

335.   Defendant knew or, in the exercise of reasonable care should have known, that tests limited to Roundup®'s active ingredient glyphosate and Roundup®'s adjuvants and "inert"

ingredients, and/or the surfactant POEA were insufficient to prove the safety of Roundup®.

336.    Defendant also knew or, in the exercise of reasonable care should have known, that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup® and glyphosate-containing products and Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA.

337.    As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, packaging, sale, and distribution of its Roundup® products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, adjuvants and "inert" ingredients, and the surfactant POEA, and knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or to adequately warn of these risks and injuries.

338.    Defendant failed to appropriately and adequately test Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiffs from Roundup®.

339.    Despite the ability and means to investigate, to study, and to test its products and to provide adequate warnings, Defendant has failed to do so.

340.    Upon information and belief, Defendant has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate and Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA.

341.    Defendant's negligence includes:

A.      Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate

pre- and post-market testing;

B.    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

C.    Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture, horticulture, and at-home use;

D.    Failing to undertake sufficient studies and failing to conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants and/or surfactants contained within Roundup®, and the propensity of these ingredients to render Roundup® toxic or increase the toxicity of Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether or not "inert" ingredients and/or adjuvants were safe for use;

E.    Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

F.    Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

G.    Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and/or be exposed to its Roundup® products;

H.    Failing to disclose to Dr. Rumage, users, consumers, and the general public that the use of and exposure of Roundup® presented severe risks of cancer and other grave illnesses;

I.    Failing to warn Dr. Rumage, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other users or consumers;

J.    Systemically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

K.    Representing that its Roundup® products were safe for their intended use when in fact, Defendant knew or should have known that the products were not safe for their intended use;

L.    Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

M.    Advertising, marketing, and recommending the use of Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

N.    Continuing to disseminate information to its consumers, which fail to indicate or imply that Defendant's Roundup® products are unsafe for use in the agricultural, horticultural industries, and/or home use; and

O.    Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

342.   Defendant knew and/or should have known that it was foreseeable that consumers and/or

users, such as Dr. Rumage, would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

343.   Dr. Rumage and Plaintiffs did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate and Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA.

344.   Defendant's negligence was the proximate cause of the injuries and death of Dr. Rumage and the harm and economic losses that Plaintiffs suffered as described herein.

345.   Defendant's conduct, as described above, was reckless.

346.   Defendant regularly risked the lives of consumers and users of its products, including Plaintiffs' father, with full knowledge of the dangers of its products.

347.   Defendant intentionally made decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Dr. Rumage.

348.   Defendant's reckless conduct therefore warrants an award of punitive damages.

349.   As a proximate result of Defendant's wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature glyphosate and Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA, Dr. Rumage suffered grave injuries, repeatedly endured pain and discomfort associated with the disease and the drug therapy, radiation treatments, and ultimately died from the disease caused by exposure to Defendant's product, as well as economic hardship incurred by the Plaintiffs, including considerable financial expenses.

350.   Defendant is justly and truly responsible for all damages it caused to Dr. Rumage and Plaintiffs and for all damages itemized herein, including costs and interest.

## CLAIM SIX: REDHIBITION (IMPLIED WARRANTY)

351.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein, and further allege:

352.    This claim in redhibition is made pursuant to Louisiana's law in redhibition, including La. Civil Code Art. 2520 *et seq.*, including La. Civil Code Art. 2531 and 2545.

353.    Monsanto, manufactured glyphosate, Roundup®, and Roundup® products. Monsanto also acted as a seller, advertising and marketing the products directly to the consumer public.

354.    The carcinogenic characteristic of glyphosate, Roundup®, and Roundup® products rendered the product defective, absolutely useless, and unfit for its intended use.

355.    Most of the glyphosate, Roundup®, and Roundup® products were destroyed in the regular and anticipated use of the product.

356.    The carcinogenic characteristic of glyphosate, Roundup®, and Roundup® products existed at the time the product left the control of Monsanto., and first appeared within three days of the purchase of the product.

357.    The glyphosate, Roundup®, and Roundup® products used by Dr. Rumage and manufactured by Monsanto contained a hidden defect at the time of the sale, namely that the products were carcinogenic. The carcinogenic characteristic of the glyphosate, Roundup®, and Roundup® products used by Dr. Rumage and manufactured by Monsanto was not apparent on inspection, and rendered the products unfit for the use intended.

358.    Monsanto knew that the glyphosate, Roundup®, and Roundup® products it sold had a defect, namely that it was carcinogenic, but omitted to declare it.

359.    As the manufacturer of glyphosate, Roundup®, and Roundup® products, Monsanto is presumed to know all defects that are contained in the products.

360.    Monsanto declared that the glyphosate, Roundup®, and Roundup® products were safe and

non-carcinogenic. At the time Monsanto made the declaration, Monsanto knew in fact that the glyphosate, Roundup®, and Roundup® products were unsafe and carcinogenic.

361.  Monsanto was in bad faith to declare that the glyphosate, Roundup®, and Roundup® products were safe and non-carcinogenic when Monsanto knew in fact that the glyphosate, Roundup®, and Roundup® products were unsafe and carcinogenic.

362.  Monsanto was in bad faith not to declare that the glyphosate, Roundup®, and Roundup® products were unsafe and carcinogenic when Monsanto knew in fact that the glyphosate, Roundup®, and Roundup® products were unsafe and carcinogenic.

363.  Joseph Paul Rumage, M.D. did not know of any defect in the glyphosate, Roundup®, and Roundup® products. As a reasonably prudent buyer, he could not have known of the defects or discovered the defects.

364.  Monsanto had reason to know the particular use Dr. Rumage intended for the glyphosate, Roundup®, and Roundup® products. The glyphosate, Roundup®, and Roundup® products were not fit for the Dr. Rumage's intended use or for his particular purpose.

365.  Monsanto is liable to the Plaintiffs for the return of the price with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale, and also for damages and reasonable attorney fees.

366.  Monsanto is justly and truly indebted to Dr. Rumage and Plaintiffs for the reimbursement of the reasonable expenses occasioned by the sale, and for nonpecuniary damages, punitive damages, and reasonable attorney fees.

## CLAIM SEVEN: NEGLIGENCE (TOXIC SUBSTANCES)

367.  Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein, and further allege:

368.  Plaintiffs bring this negligence claim against Defendant under La. Civil Code Art. 2315 and

2315.3 (repealed prospectively only).

369.   Monsanto proceeded in disregard of a high and excessive degree of danger regarding the release of chemicals including glyphosate, Roundup®, and Roundup® products at its Luling manufacturing plant while Dr. Rumage was present at the glyphosate production facility in Luling.

370.   The release of such chemicals at its Luling manufacturing plant while Dr. Rumage was present was an extreme departure from ordinary care and created an apparent and high degree of danger.

371.   It was wanton, reckless, and highly unreasonable conduct for Monsanto to allow the release of glyphosate, Roundup®, and Roundup® products at its Luling manufacturing plant while Dr. Rumage was present.

372.   It was wanton, reckless, and highly unreasonable conduct for Monsanto to allow its employees to present themselves to Dr. Rumage for examination in the work clothes that had been exposed to and that carried glyphosate, Roundup®, and Roundup® products.

373.   The danger created by the Monsanto's wanton, reckless, and highly unreasonable conduct threatened or endangered the public safety of Joseph Paul Rumage, M.D. and the nearby community. The actions by Monsanto were an extreme departure from ordinary care, in a situation where a high degree of danger was apparent.

374.   Monsanto's wanton or reckless conduct occurred in the storage, handling or transportation of hazardous or toxic substances.

375.    Dr. Rumage's injuries were the directly and proximately injury caused by Monsanto's wanton, reckless, and highly unreasonable conduct.

376.   Defendant's conduct has been particularly reprehensible, *i.e.* outrageously wanton and reckless, motivated by malice or fraud, with reckless and indifference and without any

regard for the safety of the consuming public.

377.  The aforesaid action of Defendant were caused by an improper and evil motive. Defendant was motivated by self-interest and placed profits ahead of people.

378.  Defendant has persistently distributed and marketed to the public an inherently dangerous product, namely the Roundup® products, with full knowledge of its injury-causing effect among the consuming public.

379.  Monsanto was improperly motivated. Monsanto placed the profits to its coffers ahead of the safety of the community. Over 400 acres of the Monsanto facility at Luling is dedicated to the production of glyphosate. While glyphosate has recently been found in children's cereal, the high profit from uninterrupted glyphosate production has been the lucre that feeds the corporate beast. Monsanto's choices in placing profit ahead of people offends the public morals and the traditional motives of fair play.

380.  Monsanto is liable to Dr. Rumage and Plaintiffs for exemplary (punitive) damages in addition to other damages due to its wanton or reckless disregard for public safety in the storage, handling, or transportation of hazardous or toxic substances.

## CLAIM SEVEN: PUNITIVE DAMAGES

381.  Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein, and further allege:

382.  This claim is asserted in conformity with La. Civil Code Art. 3546.

383.  Monsanto is domiciled in Delaware.

384.  Upon information and belief, all reprehensible and injurious conduct by Monsanto, including the decisions to distribute and to market the Roundup® products with knowledge of its injury-causing effect among the consuming public, the decision not to disclose to Plaintiff and the public the known and unreasonable danger of the Roundup® products, the

decision not to disclose the actual adjuvants and surfactants used in the Roundup®

products, and the decision to suppress any information and research that may be adverse to

the Roundup® products, occurred in the State of Delaware.

385. Defendant's conduct has been particularly reprehensible, *i.e.* outrageously reckless,

motivated by malice or fraud, or without any regard for the safety of the consuming public.

Defendant has persistently distributed and marketed to the public an inherently dangerous

product, namely the Roundup® products, with knowledge of its injury-causing effect

among the consuming public.

386. Defendant has risked the lives of consumers and users of its products, including Dr.

Rumage, with knowledge of the unreasonably dangerous conditions and damages created

associated with Roundup® and glyphosate-containing products, and suppressed this

knowledge and the dissemination of this knowledge from Plaintiffs and the general public.

Defendant deliberately chose not to redesign, warn, or inform Dr. Rumage and the

unsuspecting public.

387. Defendant's conduct and choices in its behavior were based on an evil motive, namely

continued outrageous profits at any cost to the public, and/or reckless indifference to the

unreasonable danger that its actions and the Roundup® products posed to the public.

388. Defendant's reckless conduct warrants an award of punitive damages, including such other

damages as may be allowed under Delaware law.

## **PRAYER FOR DAMAGES**

389. As a result of the aforesaid actions of Defendant, Defendant is justly and truly indebted to

Joseph Paul Rumage, M.D. and Plaintiffs for all damages caused by Defendant's actions

and failures to act. Joseph Paul Rumage, M.D. and Plaintiffs were damaged by Defendant,

and Joseph Paul Rumage, M.D. and Plaintiffs are entitled to and seek all damages

reasonable in the premises, including:

A.      Wrongful death of Joseph Paul Rumage, M.D.;

B.      Dr. Rumage's pain and suffering;

C.      Mental anguish and anxiety;

D.      Lost wages and earning capacity;

E.      Past medical expenses;

F.      Loss of enjoyment of life;

G.      Permanent injury;

H.      Funeral and other expenses; and

I.      Punitive damages;

J.      Shortened life expectancy;

K.      Nonpecuniary damages;

L.      Attorney fees;

M.      All other damages inherent in these pleadings, or which may appear through

        discovery or trial of this case.

### DEMAND FOR TRIAL BY JURY

390.   Plaintiffs demand a trial by jury on any and all issues triable of right by a jury.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, Sarah Rumage Whalen, Joseph P. Rumage, Jr., and William

Simms Rumage, individually and as the surviving children of Joseph Paul Rumage, M.D., pray that

a certified copy of this Complaint be issued to Defendant Monsanto Company, that it be served

with a summons and that Defendant be cited to answer each and every allegation expressed hereby,

that Plaintiffs be granted a trial by jury on all issues so triable, and that after all due delays and

proceedings there be judgment in favor of plaintiffs, Sarah Rumage Whalen, Joseph P. Rumage, Jr., and William Simms Rumage, individually and as the surviving children of Joseph Paul Rumage, M.D., and against Defendant, Monsanto Company, condemning Monsanto Company to pay to Plaintiffs an award of damages as requested, including compensatory damages, nonpecuniary damages, punitive damages, attorney fees, costs, and interest, in such amount as if fair, legal, just and equitable.

Plaintiffs pray for all other relief as may be appropriate.

Respectfully submitted this 12th day of April, 2019.

s/Joseph Paul Rumage, Jr.
Joseph Paul Rumage, Jr. (La. Bar No. 01574)
Counsel for Sarah Rumage Whalen,
Joseph P. Rumage, Jr., and
William Simms Rumage
Law Office of Paul Rumage, Jr.
P.O. Box 1174
Denham Springs, LA 70727
Telephone:     (504) 458-3999
Facsimile:     (225) 243-4735
Email: RumageLawOffice@cs.com